[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-13979

_____

D.C. Docket No. 1:13-cr-00421-ODE-RGV-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FREDRICK TODD ANDERSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(February 3, 2016)

Before HULL and JILL PRYOR, Circuit Judges, and CONWAY,[*] District Judge.

PER CURIAM:

Fredrick Todd Anderson appeals his total sentence of 235 months'

imprisonment for one count of carjacking, one count of attempted robbery, and one

_____

[*] Honorable Anne C. Conway, United States District Judge for the Middle District of
Florida, sitting by designation.

count of brandishing a firearm during a crime of violence.  After careful review of the record and briefs, and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

A federal grand jury charged Anderson and two co-defendants with (1) one count of conspiracy to commit robbery, in violation of 18 U.S.C. § 1951(a) (Count One); (2) two counts of attempted robbery, in violation of 18 U.S.C. § 1951(a) (Counts Two and Four); (3) one count of taking by force, violence, and intimidation a car that had been transported in interstate commerce, in violation of 18 U.S.C. § 2119 (Count Three); and (4) one count of using and brandishing a firearm in the course of an attempted robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Five).  Anderson pled guilty to Counts Three (carjacking), Four (attempted robbery), and Five (using and brandishing a firearm) pursuant to a 17-page written plea agreement.

### A.    Offense Conduct

We recount the facts from the government's factual proffer at Anderson's plea hearing, as well as the presentence investigation report ("PSI").  In the early morning of March 11, 2013, Anderson, David Starks, Deshawn Mackey, and two juveniles decided to rob Duty Free America ("DFA"), a business that provided duty free goods to shops in the Atlanta airport.  DFA was next door to J&D Trucking ("J&D"), a different business.

2

Anderson and his accomplices planned to rob DFA's manager as he was opening the store, so they drove Starks' car to DFA at some time between 3:00 AM and 4:00 AM and waited for the manager to arrive. Soon thereafter, Paul Moser, a 63-year-old J&D employee, arrived for work and pulled up next to Starks' car.

Anderson and his accomplices spontaneously decided to rob Moser instead of DFA. Anderson and his accomplices ran up to Moser, beat him, took his wallet, cell phone, wedding ring, and car keys, and forced him into the backseat of Starks' car. The juveniles drove away in Moser's car.

With Starks driving, Mackey in the front passenger's seat, and Anderson in the backseat with Moser, the attackers drove Moser to several automatic teller machines ("ATMs") in an effort to withdraw money from Moser's bank account. Initially, Anderson struck Moser because he was not providing the personal identification number for his debit card quickly enough. As they drove between ATMs, Anderson struck Moser several more times and threatened to kill him, while Mackey pressed a gun to Moser's forehead.

The attackers ultimately were only able to withdraw $60 from Moser's bank account, which made them angry. The attackers asked Moser where he lived and what kind of valuables he had at his home. When Moser told the attackers where

3

he lived, the attackers determined that he lived too far away and stated that they should just kill him.

At some point, Moser told his attackers that there was $5,000 in a strongbox at J&D and that he would give it to them in exchange for his freedom. The attackers began driving back to J&D and allowed Moser to call a J&D coworker in order to arrange for a quick exchange. Moser called his coworker and asked him to bring the strongbox out to the parking lot. However, there was no strongbox with $5,000 at J&D. Rather, Moser was trying to signal that he needed help. The coworker recognized this and called 911. By the time the attackers approached J&D, the police had arrived. The attackers spotted a police car at J&D, so they turned around and drove away with Moser still in the car.

Next, the attackers drove Moser to a residential subdivision, led him behind a vacant house, and told him that they were going to kill him. Moser believed the attackers were going to execute him. Despite their repeated death threats, the attackers did not kill Moser. Rather, Anderson pistol whipped Moser in the face and pushed him into a small pond. Moser remained motionless on the ground and the attackers eventually left. Moser crawled back to the roadway and began walking to find help.

At approximately 6:00 AM, responding police officers located Moser. Moser had significant injuries to his left eye, mouth, and nose, and was bleeding

4

from his face.  Medical professionals later determined that Moser suffered multiple

facial fractures that would require surgery to save the use of his left eye.

## B.    Plea Agreement

Paragraph eight of the written plea agreement addressed the "Base Offense

Level and Specific Offense Characteristics," which are found in Chapter Two of

the Sentencing Guidelines.  In paragraph eight, the parties agreed that these

specific offense characteristics applied as follows:

> 8. The parties agree to recommend to the Court that the following Sentencing Guidelines Base Offense Level and Specific Offense Characteristics Apply to Counts Three and Four:
>
> > a.  The Base Offense Level is 20 under [U.S.S.G.] § 2B3.1(a);
> >
> > b. § 2B3.1(b)(3)(B) applies and imposes a 4-level increase for Serious Bodily Injury;[1]
> >
> > c. § 2B3.1(b)(4)(A) applies and imposes a 4-level increase for abduction;
> >
> > d. § 2B3.1(b)(5) applies and imposes a 2-level increase for carjacking;
> >
> > e. [§] 2B3.1(b)(7)(A) applies and imposes no increase because the value of the vehicle was less than $10,000.

Importantly, the plea agreement did not prohibit the government from

making other recommendations about the application of the Guidelines.  Just the

opposite.  The plea agreement unambiguously provided that the government

---

[1]The potential increase for the degree of bodily injury was six levels.  See U.S.S.G. § 2B3.1(b)(3)(C) (adding six levels for "Permanent or Life-Threatening Bodily Injury").

5

reserved the right to inform the court of all facts and circumstances regarding Anderson and, most notably, to make recommendations regarding application of the Guidelines "except as expressly stated elsewhere in [the] plea agreement":

### Right to Answer Questions, Correct Misstatements, and Make Recommendations

15. The Government reserves the right to inform the Court and the Probation Office of all facts and circumstances regarding the Defendant and this case, and to respond to any questions from the Court and the Probation Office and to any misstatements of fact or law. **Except as expressly stated elsewhere in this Plea Agreement**, the Government also reserves the right to make recommendations regarding application of the Sentencing Guidelines.

(emphasis added). The government therefore reserved the right to recommend the application of other Guidelines provisions as long as such a recommendation did not violate the express terms of the plea agreement.

The agreement also provided that the government was not bound by the guidelines recommendations in the agreement if additional evidence sufficient to support a different application of the Guidelines was discovered. Additionally, pursuant to the agreement, the government agreed to recommend that Anderson be sentenced at "the low end of [his] adjusted guideline range."

The plea agreement further provided that the court had discretion to depart from the Guidelines and that no one could predict Anderson's sentence:

9. The Defendant understands that, before imposing sentence in this case, the Court will be required to consider, among other factors, the provisions of the United States Sentencing Guidelines and

6

that, under certain circumstances, the Court has the discretion to depart from those Guidelines. The Defendant further understands that the Court may impose a sentence up to and including the statutory maximum as set forth in this paragraph and that no one can predict his exact sentence at this time.

The agreement also made it clear that the court was not bound by any recommendations or guidelines computations in the plea agreement.

The plea agreement contained an appeal waiver stating, inter alia, that Anderson waived his right to appeal his sentence and conviction unless he received a sentence "greater than 16 years," which is 192 months.

Finally, the plea agreement also contained an integration clause, which stated that there were "no other agreements, promises, representations, or understandings between [Anderson] and the Government." Anderson and his counsel both signed the agreement.

## C.    Change of Plea Hearing

At Anderson's change of plea hearing, the district court asked the parties for an estimate of Anderson's advisory guidelines range. In response, the government estimated that the low end of Anderson's guidelines range would be 184 months. Anderson agreed with that estimate. The district court reminded the parties, however, that it "[could not] know until the sentencing hearing what the Guidelines [were] going to be."

7

Anderson confirmed that the government promised him nothing outside of the written plea agreement to get him to plead guilty.

## D.    Sentencing Guidelines Calculations

1.    Chapter Two, Part B, "Basic Economic Offenses," Section Three, entitled "Robbery, Extortion, and Blackmail"

With respect to Count Three (carjacking of Moser), the probation officer assigned Anderson a base offense level of 20, pursuant to § 2B3.1(a).  The probation officer then applied these "specific offense characteristics": a four-level enhancement under § 2B3.1(b)(3)(B) because the victim sustained serious bodily injury; a second four-level enhancement under § 2B3.1(b)(4)(A) because the victim was abducted and taken to various ATM locations; and a two-level enhancement under § 2B3.1(b)(5) because the offense involved carjacking.  These specific offense characteristics were expressly referenced in the plea agreement. The probation officer also recommended a five-level enhancement under § 2B3.1(b)(2)(C) for brandishing a firearm, which was not expressly referenced in the plea agreement.  Thus, as to Count Three, Anderson's total offense level was 35.

With respect to Count Four (attempted robbery of J&D), the probation officer assigned Anderson a base offense level of 20, pursuant to § 2B3.1(a).  The probation officer then applied these "specific offense characteristics": a four-level enhancement under § 2B3.1(b)(3)(B) because the victim sustained serious bodily

injury, and a second four-level enhancement under § 2B3.1(b)(4)(A) because the victim was abducted and taken to a vacant house. These specific offense characteristics were expressly referenced in the plea agreement. Thus, as to Count Four, Anderson's total offense level was 28.

2.    Chapter Three, Part D, entitled "Multiple Counts"

The probation officer determined that Counts Three and Four were excluded from grouping into a single group under U.S.S.G. § 3D1.2(d). Part D of Chapter Three of the Guidelines is entitled "Multiple Counts" and contains the rules that apply to multiple counts in the same indictment for which the defendant has been convicted.

According to the probation officer, Moser was the victim in Count Three, while J&D was the victim in Count Four. The probation officer further noted that the carjacking of Moser (Count Three) occurred first, and that the attempted robbery of J&D (Count Four) occurred "[a]fter considerable time lapsed." Thus, the probation officer maintained that Counts Three and Four should not be grouped because they were "separate incidents and involve[d] two separate victims."

To calculate the combined offense level for the separate counts, the probation officer applied the rules contained in U.S.S.G. § 3D1.4. In doing so, the probation officer used the total offense level of 35 from Count Three, which was the greater total offense level between Counts Three and Four, and added one level

9

pursuant to the table in § 3D1.4, yielding a combined offense level of 36. The probation officer then applied a three-level reduction for acceptance of responsibility, pursuant to § 3E1.1(a) and (b), yielding a total offense level of 33 for Counts Three and Four. For Count Five (brandishing a firearm), the probation officer determined that, pursuant to U.S.S.G. § 2K2.4(b), Anderson's guidelines range was the seven-year mandatory minimum imposed by 18 U.S.C. § 924(c)(1)(A)(ii).

3.    Chapter Four, Part B, entitled "Criminal History"

Anderson had a criminal history category of IV because of (1) a prior theft-by-receiving conviction where his offense conduct involved the theft of over 80 firearms from a firearms dealer; (2) a prior felony burglary conviction; and (3) violations of probation and supervised release, including committing the instant offenses while on probation.

Based on his criminal history category of IV and total offense level of 33, Anderson's guidelines range was 188 to 235 months' imprisonment as to Counts Three and Four, plus 84 months' imprisonment as to Count Five, to run consecutively to the sentences for Counts Three and Four, resulting in a total advisory guidelines range of 272 to 319 months' imprisonment.

10

### E.    Sentencing Hearing

At the sentencing hearing, Anderson argued that Counts Three and Four should be grouped under the multi-count rules contained in U.S.S.G. § 3D1.2. In response, the government asserted that the probation officer correctly declined to group Counts Three and Four because in the attempted robbery encompassed by Count Four, J&D was the direct victim while Moser was a subsidiary victim. The district court ultimately sided with the government and overruled Anderson's objection that Counts Three and Four should be grouped under § 3D1.2.

Anderson also argued that the government's grouping position at sentencing was inconsistent with, and therefore a breach of, the plea agreement. In light of the alleged breach, Anderson asked the district court for specific performance of the plea agreement. The district court disagreed with Anderson and concluded that the government had not breached the plea agreement because the agreement did not commit the government in any way to agree that Counts Three and Four should be grouped together.

Also at sentencing, Anderson objected to the probation officer's recommendation that the § 2B3.1(b)(2)(C) brandishing enhancement be applied to Count Three. Following argument from Anderson, the district court asked if the government had a response. In response, the government prosecutor stated that as "an officer of the court," she had to tell the court that the probation officer was

11

correct, but her response did not amount to a recommendation of that enhancement:

> The plea agreement provides that the parties agree that certain applications apply under the guideline range. It does not state that I . . . am prohibited from saying any other ones apply, but I think I will say that under the plea agreement I don't know that I can say anything more other than, as an officer of the court, I think I have to tell you that I believe the probation officer is correct in her assessment. That doesn't mean I am recommending it.

At that point, Anderson objected to the government's statement as a breach of the plea agreement. The district court pointed out, "[i]t would be clearer if the plea agreement said that the following specific offense characteristics apply and none others, but I can see how you could argue that under the rule of lenity that the defendant wins out on that one." Accordingly, the district court sustained Anderson's objection to the brandishing enhancement.

The probation officer then recalculated Anderson's advisory guidelines range to reflect the district court's ruling, and stated that Anderson's total offense level was 29, his criminal history category was still IV, and his advisory guidelines range for Counts Three and Four was 121 to 151 months' imprisonment. The court explained that, with the additional 84-month consecutive sentence mandated by Count Five, Anderson's advisory guidelines range was 205 to 235 months' imprisonment.[2]

---

[2]If Counts Three and Four had been grouped pursuant to § 3D1.2, then Anderson's

12

With the guidelines calculations sorted out, the district court solicited arguments regarding the 18 U.S.C. § 3553(a) factors.[3]  Anderson argued that his criminal history category overstated the severity of his criminal history and that his co-defendants had received comparatively lower sentences.  Anderson asked the court to consider all of that and impose a significantly below-guidelines sentence of 144 months' imprisonment or less.

In response, the government argued that Anderson's criminal history category accurately reflected the severity of his past offenses.  The government also noted that Anderson engaged in a leadership role to execute a "horrific" offense.  While the government acknowledged that it was bound by the plea agreement to recommend a sentence at the low end of Anderson's applicable guidelines range, it argued that Anderson "clearly [did] not deserve anything below the low end of the guideline range."  Anderson did not object to the government's response as violating the plea agreement or otherwise.

---

advisory guidelines range would have been 100 to 125 months' imprisonment, followed by 84 months' imprisonment to run consecutively as to Count 5, yielding a total advisory guidelines range of 184 to 209 months' imprisonment.

[3]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a).

After considering the § 3553(a) factors, the district court sentenced Anderson to 151 months each as to Counts Three and Four to run concurrently to one another, and 84 months as to Count Five to run consecutively to the other sentences, yielding a total sentence of 235 months' imprisonment. Following the pronouncement of the sentence, Anderson objected to his total sentence as unreasonable and renewed his previous objections.

## II.    ISSUES ON APPEAL

On appeal, Anderson argues that the government breached the plea agreement in three instances at sentencing by: (1) agreeing with the probation officer that the offenses in Count Three (carjacking of Moser's car) and Count Four (attempted robbery of J&D) should not be grouped together under U.S.S.G. § 3D1.2; (2) answering the district court's question as to whether the probation officer's assessment of a five-level enhancement for brandishing a firearm under U.S.S.G. § 2B3.1(b)(2)(C) was legally correct, but adding that its response did not amount to a recommendation of that enhancement; and (3) discussing aggravating factors at sentencing, and, in so doing, paying mere lip service to the plea agreement's requirement that the government recommend a sentence at the low end of Anderson's advisory guidelines range.

Anderson also argues that, in the calculations of his advisory guidelines range, the district court erred in declining to group Counts Three (carjacking) and

14

Four (attempted robbery) because, he contends, those counts involved the same victim and the same series of acts or transactions. Further, Anderson maintains that his 235-month total sentence, at the top of his advisory guidelines range, is unreasonable because his criminal history category overstated the severity of his prior convictions and his sentence is unwarrantedly disparate from those of his co-defendants.

## III.    STANDARD OF REVIEW

When the defendant has preserved his objection in the district court, we review <u>de novo</u> whether the government breached the plea agreement. <u>United States v. Copeland</u>, 381 F.3d 1101, 1104 (11th Cir. 2004). Where a defendant fails to object, however, we review only for plain error. <u>Puckett v. United States</u>, 556 U.S. 129, 135-36, 143, 129 S. Ct. 1423, 1428-29, 1433 (2009); <u>see also</u> <u>United States v. De La Garza</u>, 516 F.3d 1266, 1269 (11th Cir. 2008). "Under plain error review, there must be (1) an error, (2) that is plain, (3) that affects the defendant's substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." <u>De La Garza</u>, 516 F.3d at 1269. For an error to be plain, it "must be clear or obvious, rather than subject to reasonable dispute." <u>Puckett</u>, 556 U.S. at 135, 129 S. Ct. at 1429.

We review <u>de novo</u> the district court's interpretation of the Guidelines and its application of the Guidelines to the facts. <u>United States v. Register</u>, 678 F.3d

15

1262, 1266 (11th Cir. 2012).  However, we review for clear error the district court's findings of fact.  Id.

We review the reasonableness of a sentence under a deferential abuse of discretion standard.  Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007).

## IV.    DISCUSSION

### A.    Plea Agreements

"The government is bound by any material promises it makes to a defendant as part of a plea agreement that induces the defendant to plead guilty."  United States v. Taylor, 77 F.3d 368, 370 (11th Cir. 1996).  The government breaches a plea agreement when it advocates for a position "flatly inconsistent" with its previous promise.  See id.

This Court interprets plea agreements using the following three principles: first, "a hyper-technical reading of the written agreement and a rigidly literal approach in the construction of language should not be accepted"; second, the written agreement is "viewed against the background of the negotiations and should not be interpreted to directly contradict an oral understanding"; and third, "a plea agreement that is ambiguous must be read against the government."  United States v. Jefferies, 908 F.2d 1520, 1523 (11th Cir. 1990) (quotation marks and alterations omitted).  Nevertheless, this Court will consider extrinsic evidence

16

"[o]nly where the language of the agreement is ambiguous, or where government overreaching is alleged." Copeland, 381 F.3d at 1105 (quotation marks omitted).

## B.    Relevant Grouping Law in Chapter Three, Part D

The Sentencing Guidelines call for grouping counts together where "conduct that represents a separate count, e.g., bodily injury or obstruction of justice, is also a specific offense characteristic in or other adjustment to another count." U.S.S.G. § 3D1.2(c) cmt. 5. This provision "prevents 'double counting' of offense behavior," but applies only where the offenses are closely related. Id.

The Sentencing Guidelines also call for grouping when two or more counts involve "the same victim and the same act or transaction" or "the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2(a) and (b). "Victim" as used in § 3D1.2 "is not intended to include indirect or secondary victims." Id. cmt. n.2. "Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim." Id.

## C.    Breach of Anderson's Plea Agreement

### 1.    Grouping

The government did not breach the plea agreement by agreeing with the probation officer's grouping determination. In the plea agreement, the government

17

agreed to jointly recommend that certain specific offense characteristics and base offense level calculations would apply to Anderson's guidelines calculation for Counts Three and Four. **[Doc. 34-1 at 5]** Specifically, the plea agreement provided for a specific base offense level calculation under § 2B3.1(a), and dictated the consideration of four specific offense characteristics under §§ 2B3.1(b)(3)(B), (b)(4)(A), (b)(5), and (b)(7)(A). **[Id. at 5]** However, "[e]xcept as <u>expressly</u> stated elsewhere" in the plea agreement, the government "reserve[d] the right to make recommendations regarding application of the Sentencing Guidelines." (emphasis added). **[Id. at 8]**

The plea agreement was not ambiguous in this respect, nor is our interpretation of the unambiguous plea agreement "hyper-technical." <u>Jefferies</u>, 908 F.2d at 1523. Rather, the plea agreement expressly governed only the application of one base offense level calculation and four specific offense characteristics, which are found in Chapter Two, Part B, and said nothing about, and certainly did not bind the government to, any application of the separate grouping rules, which are found in Chapter Three, Part D. In fact, the plea agreement did not mention § 3D1.2 or § 3D1.4's multiple-count grouping rules at all, let alone "expressly" dictate their application to Anderson's advisory guidelines calculation.

In sum, whether the offenses in Counts Three and Four were to be grouped under the rules in § 3D1.2 was not contained within, much less restricted by, the

scope of the plea agreement. Rather, pursuant to the terms of the plea agreement, the government reserved the right to independently opine about the applicability of § 3D1.2 to Anderson's sentence, which necessarily included the option of agreeing with the probation officer's assessment.

We find no merit in Anderson's argument that the guidelines range estimate provided by the government at his change of plea hearing constitutes powerful extrinsic evidence that the plea agreement was meant to group Counts Three and Four. As described above, the terms of the plea agreement were unambiguous, which means we should not look to extrinsic evidence to import any meaning into the plea agreement. See Copeland, 381 F.3d at 1105. Indeed, this plea agreement has both an "except as expressly stated" and an integration clause.

Additionally, the government's statements at the change of plea hearing did not somehow constitute an agreement to recommend a 184-month sentence that it subsequently breached. Rather, the government provided its estimate of the guidelines range only in response to the district court's questioning, and only in the context of anticipating, at that moment, where the guidelines range could possibly end up. In fact, both the district court and the plea agreement itself reminded the parties that no one could predict Anderson's advisory guidelines range at the time of the plea. Moreover, the plea agreement did not contain a provision mentioning, much less requiring, a 184-month sentencing recommendation.

19

We similarly find no merit in Anderson's argument that the appeal waiver and the use of the phrase "Counts Three <u>and</u> Four" in paragraph eight of the plea agreement demonstrate the existence of an express agreement to jointly recommend the grouping of Counts Three and Four pursuant to § 3D1.2. (emphasis added).  The appeal waiver and the phraseology of paragraph eight's language are not "express[] state[ments]" concerning the government's "right to make recommendations regarding application of the Sentencing Guidelines." Thus, Anderson is forced to argue that the plea agreement implies that the parties agreed to group Counts Three and Four pursuant to § 3D1.2.  In fact, at oral argument, Anderson conceded that the plea agreement never mentioned "grouping," Chapter Three, or § 3D1.2 and, therefore, his sole contention was that an "implied" agreement existed.

But paragraph 15 of the plea agreement explicitly precludes the parties from inferring the existence of a tacit or implied agreement concerning the government's ability to make Guidelines recommendations.  If paragraph 15 of the plea agreement did not exist, then Anderson would have a stronger argument. However, the language contained in paragraph 15 unambiguously defeats the notion that an implied agreement further limiting the government's ability to make Guidelines recommendations existed.  Because the very terms of the plea

agreement negate the possibility that an implied agreement existed, we refuse to read between the lines to find one.

2.    Brandishing Enhancement

On appeal, Anderson asserts that the government breached the plea agreement when it agreed with the probation officer's assessment of a brandishing enhancement under U.S.S.G. § 2B3.1(b)(2)(C).  In the PSI, the probation officer assessed the brandishing enhancement on Count Three, the carjacking.  In response, the government argues that the plea agreement did not expressly address the applicability of § 2B3.1(b)(2)(C) and, therefore, it was not bound to make any particular recommendation regarding that specific subsection.

We need not decide whether paragraph eight of the plea agreement encompassed any other possible offense characteristics contained in § 2B3.1.  Even assuming it did, the government's statements at sentencing did not breach the plea agreement.  The court, not the government, brought up the brandishing enhancement.  The government's counsel then responded to a question from the district court and, as an officer of the court, was obligated to offer a truthful response to the question asked.  In doing so, the government's attorney stated:  "I believe the probation officer is correct in her assessment.  That doesn't mean I am recommending it."  Because the government was responding to a question from the court as best as it could under the circumstances and immediately added that its

21

response did not amount to a recommendation, the government's statements did not amount to a breach. See Taylor, 77 F.3d at 370.

In any event, regardless of whether or not the government breached the plea agreement, any error was harmless as the district court sustained Anderson's objection to that brandishing enhancement, and that enhancement was not used in the calculation of Anderson's advisory guidelines range. See Puckett, 556 U.S. at 141, 129 S. Ct. at 1432 (holding that the breach of a plea agreement is not a structural error that "necessarily render[s] a criminal trial fundamentally unfair," nor does it "defy analysis by harmless-error standards by affecting the entire adjudicatory framework") (quotation marks omitted).

3.    Aggravating Factors

As to the government's presentation of aggravating factors at sentencing, we review that issue for plain error as Anderson made no objection about it at sentencing. De La Garza, 516 F.3d at 1269. Here, there is no error, much less plain error, because the government did not breach the plea agreement when discussing the § 3553(a) factors. The government was responding directly to Anderson's inaccurate factual assertions regarding his criminal history and the alleged sentencing disparities between him and his co-defendants. The government was also responding to Anderson's legal argument that a below-guidelines sentence was warranted. Because the government preserved the right

22

"to respond to . . . any misstatements of fact or law," its arguments did not constitute a breach of the plea agreement.  Rather, the plea agreement only bound the government to recommend a sentence at the bottom end of Anderson's advisory guidelines range, which is precisely what the government did.

**D.    Merits of Grouping Under U.S.S.G. §§ 3D1.2(a), (b), and (c)**

As to the merits of the grouping issue, we cannot say that the district court erred by declining to group Counts Three and Four.  For starters, Counts Three and Four were distinct crimes, both in the temporal sense and with respect to the underlying offense conduct.  Count Three involved the carjacking, abduction, beating, and robbery of Moser.  Count Four, on the other hand, involved the attempted robbery of J&D and subsequent beating and disposal of Moser.  Moreover, though they happened the same morning, the carjacking of Moser occurred roughly two hours before the defendants formed the idea of robbing J&D.  It was only after Anderson and his co-defendants made multiple attempts to withdraw money with Moser's debit card at various ATM machines, and only after they beat Moser, that they formed the idea of robbing J&D.

That said, Counts Three and Four should not have been grouped under U.S.S.G. § 3D1.2(c).  The initial carjacking, abduction, and beating of Moser that comprised the specific offense characteristic enhancements of Count Three was not the same underlying conduct that formed the factual basis for Count Four.

23

Moreover, the taking of Moser to a vacant house and subsequent pistol whipping of Moser's face that comprised the specific offense characteristic enhancements of Count Four was not the same underlying conduct that formed the factual basis of Count Three. As such, grouping under § 3D1.2(c) was not necessary to avoid "double counting," as the specific offense characteristics in Count Three were not the same offense conduct represented in Count Four, and vice versa. U.S.S.G. § 3D1.2(c) cmt. n.5; see United States v. Doxie, ___ F.3d ___, No. 15-11161, 2016 U.S. App. LEXIS 5, at *14-17 (11th Cir. Jan. 4, 2016).

Similarly, Counts Three and Four should not have been grouped under U.S.S.G. § 3D1.2(a) or (b). The only victim in Count Three was Moser. In Count Four, J&D was the primary victim, as funds housed in a J&D strongbox (albeit fictional) were the clear object of the attempted robbery. And while Moser was an "indirect or secondary victim" in Count Four, he was not the "victim" in Count Four for the purposes of § 3D1.2. See U.S.S.G. § 3D1.2 cmt. n.2.

In sum, the common sentencing enhancements and temporal proximity of Counts Three and Four do not negate the fact that two separate crimes involving two different victims occurred. Thus, under the particular facts of this case, we cannot say that the district court committed reversible error by not grouping Counts Three and Four.

24

## V.    CONCLUSION

Anderson's remaining arguments lack merit and do not warrant further discussion.  For the reasons discussed above, we affirm Anderson's convictions and sentence.

**AFFIRMED.**